**SILENCE LAW GROUP, LLC**
20235 N. Cave Creek Rd. Ste 104 # 460
Phoenix, AZ 85024

**Jeffrey Silence** (029143)
(602) 932-8358
jeff@silencelaw.com
**Gideon Esakoff** (037490)
Direct Dial: (602) 932-8560
Email: gideon@silencelaw.com
Co-Counsel for Plaintiff


**MARKO LAW, PLLC**
220 W. Congress, Fourth Floor
Detroit, MI 48220

**Nichole Omilion** (P8380)
(313) 777-7529
nichole@markolaw.com
**Jonathan Marko** (P72450)
Co-Counsel for Plaintiff

Attorneys for Brandon Robinson

# UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Brandon Robinson,<br><br>       Plaintiff,<br><br>vs.<br><br>Chas Roberts Air Conditioning, Inc. d/b/a Chas Roberts Air Conditioning & Heating,<br><br>       Defendant | Case No.: 2:24-cv-02774-MTL<br><br>**Plaintiff's Response to Defendant's Partial Motion to Dismiss Plaintiff's Third Amended Complaint** |

Plaintiff, Brandon Robinson, submits this response in opposition to Defendant's motion to dismiss Counts 1, 2, 3, 4 and 6 of Plaintiff's Third Amended Complaint.

**INTRODUCTION**

This case concerns Defendant's retaliatory and discriminatory employment practices against Plaintiff, Brandon Robinson. After enduring such treatment for years and being a top salesperson for the company, Defendant required that Plaintiff accept a significant reduction in his commission percentage upon his return from FMLA leave. When Plaintiff objected, Defendant terminated his employment.

Defendant seeks to dismiss Counts 1, 2, 3, 4, and 6 of Plaintiff's Third Amended Complaint on various legal grounds, including statute of limitations, failure to state a claim for discrimination and retaliation, and lack of causation. Plaintiff has provided sufficient evidence of discriminatory and retaliatory conduct, and all of Plaintiff's allegations must be accepted as true. In addition, all reasonable inferences must be drawn in his favor. For these reasons and as set forth further below, Defendant's motion should be denied in its entirety.

**STATEMENT OF FACTS**

Plaintiff, an African American, was employed by Defendant Chas Roberts Air Conditioning, Inc. as a Sales Consultant Associate. **Doc. 21, ¶ 8**. In 2015, Plaintiff received an increase in his commission percentages due to having the top sales performance in his region. *Id.*, **¶ 13.** In February 2016, Plaintiff received a text message from Defendant Chas Roberts' Sales Manager, Noah Senter, in which Senter used the racial slur "nigga." *Id.*, **¶ 14**. Later that month, Plaintiff discussed the incident with his

coworkers and was informed by coworker Yolanda Pittman that Noah Senter frequently used the racial slur. *Id*., ¶ **15.**

In 2017, the commission structure provided a 1% commission for $2,000,000 or more in revenue and a 0.5% commission for $1,500,000 or less in revenue. *Id.*, ¶ ¶ **16.** . In 2017, Plaintiff was the only Sales Consultant to generate over two million dollars in revenue. *Id.*, ¶ ¶ **16-18.** In February 2018, Plaintiff was informed that if he brought in $2,000,000 in revenue, he would only receive a 0.5% commission. He was then told that if he reached $2,500,000 in revenue, he would still only receive a 1% commission. *Id.*, ¶ ¶ **20.** However, this change in the commission structure only applied to Plaintiff, as he was the only one to meet the threshold for the 1% commission *Id*., ¶ ¶ **19-22.**

When Plaintiff confronted Defendant about the change in the commission structure, Sales Manager Noah Senter informed him that the adjustment was made by Defendant's Vice President, Damon Bromagen, specifically because Bromagen did not want to pay Plaintiff because of his race. *Id.* ¶ **23.** On or around February of 2018, Plaintiff then raised a verbal complaint to Defendant's Human Resources about the unequal treatment he experienced compared to his Caucasian coworkers. In response, Human Resources told him to resolve the matter directly with Noah Senter and Damon Bromagen. *Id.,* ¶ **24**.

In January 2021, Damon Bromagen was replaced by Mike Senter, the brother of Noah Senter, as Vice President. *Id*., ¶ **25.** That same month, Plaintiff had a meeting with Noah and Mike Senter to discuss the commission structure, the intentional disparate treatment against him based on his race, and the unlawful retaliation against him for having

reported Noah Senter to HR for using the "N" word and for having reported the disparate treatment based on his commission percentage being reduced. *Id.* ¶ 27-29). In response, Plaintiff was told that the changes to the commission structure were made specifically to prevent him from earning the 1% commission. *Id.* ¶ 29.

In May of 2023, Plaintiff informed the Human Resources for Defendant that he was seeking to take time off for his serious and worsening mental health conditions. *Id.* ¶ 30. Defendant did not offer Plaintiff the ability to utilize his paid sick leave. *Id.* ¶ 31. Instead of paying Plaintiff for his paid sick time, Defendant advised Plaintiff to take FMLA, in violation of A.R.S. § 23-371 et seq. *Id.* ¶ 34.

Plaintiff was approved for FMLA in May of 2023 to address his serious mental health conditions such as depression, anxiety, stress, and suicidal ideations. *Id.* ¶ 35. While on FMLA leave, Plaintiff was informed by his brother and other coworkers that Noah and Mike Senter were questioning them to obtain the reason for his hospitalization. *Id.* ¶ 36.

Plaintiff was approved to return to work on September 25, 2023. *Id.* ¶ 37. On that same day, Noah and Mike Senter presented Plaintiff with a new contract, which included a significant pay cut and a reduction in his commission percentages. *Id.* ¶ 38. This "new" commission structure was the same as the one Plaintiff initially started with at the company; however, it disproportionately impacted him because he was the only Sales Consultant who had received a raise in commission percentages above the standard rate. *Id.* ¶ 40. As a result, this "new" structure reduced his commission earnings percentage by 3%. *Id.* ¶ 41. Plaintiff's Caucasian coworkers were not similarly affected by the "new"

commission structure, as they simply remained on their existing commission percentages. In other words, none of Plaintiff's coworkers experienced a 3% reduction in their commission earnings. *Id.,* ¶ **42-43**.

Plaintiff inquired about the basis for the "new" commission structure on September 25, 2023. *Id.,* ¶ **44.** In response, Noah and Mike Senter told Plaintiff it was because his work truck was a "disaster." However, Plaintiff had not driven his work truck since May of 2023 due to being on FMLA leave. *Id.* ¶ **45.** Plaintiff proceeded to take photographs of his work truck in pristine condition and requested they look at his photos, but Noah and Mike Senter refused. *Id.* ¶ **46.** It was also around this time that Plaintiff closed all five of his sales appointments and surpassed the department's average. *Id.* ¶ **47.**

On October 2, 2023, Noah Senter called Plaintiff into his office again to sign the "new" commission contract. *Id.* ¶ **47**. When Plaintiff objected, Noah Senter informed him that his failure to immediately sign the significantly worse commission contract would be considered a voluntary resignation. *Id.* ¶ **44**. Plaintiff then confronted Defendant about the unfair treatment and the disparate impact the "new" commission structure had on him compared to his Caucasian coworkers. Plaintiff told Noah Senter that he was not resigning and that if his employment ended, it would be because Defendant Chas Roberts had terminated his employment. *Id.,* ¶ **51.**

Defendant Chas Roberts terminated Plaintiff on October 2, 2023, even though his sales were higher than all his Caucasian coworkers. *Id.,* ¶ **54**. On that same day, Plaintiff

filed a complaint with the Equal Employment Opportunity Commission ("EEOC") and the Department of Labor. *Id.,* ¶ **53.**

## STANDARD OF REVIEW

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted "tests the legal sufficiency of a claim." *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001). Federal Rule of Civil Procedure 8(a)(2) requires that a complaint contain a "short and plain statement of the claim showing that the pleader is entitled to relief." While detailed factual allegations are not necessary, the complaint must contain more than "naked assertions devoid of further factual enhancement." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 557 (2007)).

To survive a motion to dismiss, the plaintiff must allege facts that, if accepted as true, are sufficient "to raise a right to relief above the speculative level," and to "state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 555, 570; see also *Iqbal*, 129 S. Ct. at 1949-50. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 129 S. Ct. at 1949. This "plausibility" determination is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id*. at 1950. As the Supreme Court instructed in Iqbal, "[w]hen there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." Id. A

complaint need only "contain sufficient factual matter" to be "plausible." *Id*. at 1949. A court may not dismiss a complaint for factual implausibility "even if it [would] strike[] a savvy judge that . . . recovery is very remote and unlikely." *Twombly*, 550 U.S. at 556.

When analyzing the sufficiency of a complaint under Rule 12(b)(6), the well-pled factual allegations are taken as true and construed in the light most favorable to the plaintiff. *Cousins v. Lockyer*, 568 F.3d 1063, 1067 (9th Cir. 2009). A court may not consider whether the factual allegations are probably true; rather, the reviewing court must take the allegations as true, no matter how skeptical the court may be. See Twombly, 550 U.S. at 555 (a court must proceed "on the assumption that all the allegations in the complaint are true (even if doubtful in fact)"); see also *Neitzke v. Williams*, 490 U.S. 319, 327 (1989) ("Rule 12(b)(6) does not countenance . . . dismissals based on a judge's disbelief of a complaint's factual allegations"). As Justice Souter artfully explained in his dissenting opinion in Iqbal:

> The sole exception to this rule lies with allegations that are sufficiently fantastic to defy reality as we know it: claims about little green men, or the plaintiff's recent trip to Pluto, or experiences in time travel. [Iqbal, 129 S. Ct. at 1959 (emphasis added).]

A dismissal under Rule 12(b)(6) is generally disfavored by courts, as it is a dismissal on the merits. 2A JAMES W. MOORE, MOORE'S FEDERAL PRACTICE P 12.07 (2d ed. 1995).

## LAW AND ARGUMENT

**A. Plaintiff's Claims are not Time-Barred.**

Defendant asserts that Plaintiff's claims are barred by the statute of limitations. But the continuing violations doctrine permits a plaintiff to sue for all discriminatory acts that occurred during the limitations period, even if the policy or other event giving rise to the discrimination occurred outside the limitations period. *Comm. Concerning Cmty. Improvement v. City of Modesto*, 583 F.3d 690, 701 (9th Cir. 2009). "A plaintiff must show that a pattern or practice of discrimination creates an ongoing violation…pattern-or-practice claims cannot be based on 'sporadic discriminatory acts' but rather must be based on 'discriminatory conduct that is widespread." *Id*. citing *Cherosky v. Henderson*, 330 F.3d 1243, 1247 (9th Cir. 2003). The theory of continuing violations is an equitable doctrine that prevents a defendant from relying on past actions to evade responsibility for subsequent similar illegal conduct. *Lauter v. Anoufrieva*, 642 F. Supp. 2d 1060, 1100 (C.D. Cal. 2009).

The Supreme Court analyzed the continuing violation doctrine as it relates to employment discrimination practices in *National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 122 S. Ct. 2061, 153 L. Ed. 2d 106 (2002)(superseded on other grounds by the Lily Ledbetter Fair Pay Act of 2009, Pub. L. No. 111-2, 123 Stat. 5. *See, e.g., Gipaya v. Wilson*, 345 F. Supp. 3d 1286, 1297 n.3 (D. Hawai'i 2018), *aff'd sub nom. Gipaya v. Barrett*, 803 F. App'x 111 (9th Cir. 2020)). The Supreme Court distinguished discrete discriminatory acts from hostile work environment claims. "Each discrete discriminatory act starts a new clock for filing charges alleging that act." *Id.* at 113. According to the

Court, "discrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges." *Id.* at 113.

In contrast, the "very nature" of hostile work environment claims "involves repeated conduct." *Id.* at 115. The unlawful practice "occurs over a series of days or perhaps years and, in direct contrast to discrete acts, a single act of harassment may not be actionable on its own." *Id.* To determine whether a hostile work environment exists, the court may look to all the circumstances, including "component acts of the hostile work environment [that] fall outside the statutory time period." *Id.* at 116-17. "Provided that an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability." *Id.* at 117.

In this case, Plaintiff asserts a pattern of discriminatory actions, including racist rhetoric dating back to 2016, modifications to his commission structure in 2018, a reduction in commission percentage in 2023, and admissions by his managers that these changes were implemented specifically to deprive him of benefits. "[A] continuing violation is occasioned by continual unlawful acts, not by continual ill effects from an original violation." *Garcia v. Brockway*, 526 F.3d 456, 462 (9th Cir. 2008). Each paycheck reflecting the reduced compensation and each act enforcing the discriminatory policy can be viewed as part of this ongoing violation, thereby bringing the entire course of conduct within the statutory period. Accordingly, Plaintiff's claims are not time-barred.

**B. Defendant's Motion Should Be Denied Because Plaintiff Has Stated a Valid Retaliation Claim under Title VII and § 1981.**

Defendant argues that Plaintiff failed to demonstrate a sufficient temporal proximity between his protected activity and the change in commission structure, claiming this weakens the causal link for his retaliation claim under Title VII and § 1981. However, Defendant focuses solely on the timing of the claims and overlooks other evidence establishing a causal link.

To establish a prima facie claim of retaliation under Title VII and §1981, Plaintiff must show that: 1) he is engaged in a protected activity; 2) he suffered an adverse employment decision; and 3) and there was a causal link between the protected activity and the adverse employment decision. *Williams v. Alhambra Sch. Dist. No. 68*, 234 F. Supp. 3d 971, 981 (D. Ariz. 2017).

Defendant argues that Plaintiff did not engage in protected activity close enough in time to the change in the commission structure to support his Title VII and § 1981 retaliation claims. The Court in *Porter v. Cal. Dep't of Corr.*, 383 F.3d 1018, 1030 (9th Cir. 2004) recognized that while a lack of temporal proximity may make it more challenging to demonstrate causation, circumstantial evidence of a "pattern of antagonism" following the protected conduct can also give rise to an interference of causation. The Court further explains that:

> It is important to emphasize that it is causation, not temporal proximity itself, that is an element of plaintiff's prima facie case, and temporal proximity merely provides an evidentiary basis from which an inference can be drawn. The element of causation, which necessarily involves an inquiry into the motives of an employer, is highly context-specific. When there may be valid reasons why the adverse employment action was

>   not taken immediately, the absence of immediacy between the cause and effect does not disprove causation.

*Id*. (citation omitted).

Plaintiff has alleged that he complained about race-based disparate treatment in 2021 and then in 2023 after his FMLA leave. Defendant's 2023 commission reductions only, or at least disproportionately, impacted Plaintiff, which coincided with his protected complaints. Following Plaintiff's objection to signing the "new" commission structure due to disparate treatment based on his race (African American), he was terminated.

The Courts have cautioned mechanical application of temporal proximity to the causation element of retaliation. In *Coszalter*, the Court stated that:

>   [A] specified time period cannot be a mechanically applied criterion. A rule that any period over a certain time is per se too long (or, conversely, a rule that any period under a certain time is always short enough) would be unrealistically simplistic. Retaliation often follows quickly upon the act that offended the retaliator, but this is not always so. For a variety of reasons, some retaliators prefer to take their time: They may wait until the victim is especially vulnerable or until an especially hurtful action becomes possible. Or they may wait until they think the lapse of time disguises their true motivation. **We should be particularly sensitive to this last point, for if we establish a per se rule that a specified time period is too long to support an inference of retaliation, well-advised retaliators will simply wait until that period has passed**. Then--provided that the retaliator has not revealed to others his intention, and has not provided demonstrably false or pretextual reasons for his act--he may retaliate with impunity. We therefore reject any bright-line rule about the timing of retaliation. There is no set time beyond which acts cannot support an inference of retaliation, and there is no set time within which acts necessarily support an inference of retaliation. Whether an adverse employment action is intended to be retaliatory is a question of fact that must be decided in the light of the timing

> and the surrounding circumstances. In some cases, the totality of the facts may form such a clear picture that a district court would be justified in granting summary judgment, either for or against a plaintiff, on the issue of retaliatory motive; but the length of time, considered without regard to its factual setting, is not enough by itself to justify a grant of summary judgment.

*Cozalter*, 320 F.3d at 977-978 (emphasis added).

Defendant does not dispute that Plaintiff engaged in protected activity or that he suffered an adverse employment action. Instead, Defendant argues that there is no causal link between the two, asserting that too much time has passed.

This argument lacks merit. Defendant's own managers admitted that the commission change was implemented specifically to harm Plaintiff, which directly supports Plaintiff's retaliation claim. The use of the term "nigga" in a text sent to Plaintiff also indicates Defendants' underlying animus. As for temporal proximity, Plaintiff complained on September 25, 2023 about his commission percentage being reduced. He was then promptly terminated.

For these reasons, Plaintiff's claim regarding retaliation under Title VII and § 1981 should not be dismissed.

**C. Defendant's Motion Should Be Denied Because Plaintiff Sufficiently Alleges Race Discrimination Under Title VII and § 1981.**

Defendant argues that Plaintiff failed to state a prima facie case of race discrimination because the changes to the commission structure applied to all employees. However, this is factually and legally incorrect.

Title VII and § 1981 claims are governed by the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). *See Chuang v. Univ. of Cal. Davis, Bd. of Trustees*, 225 F.3d 1115, 1123 (9th Cir. 2000). Under this framework, Plaintiff bears the initial burden of demonstrating a prima facie case of racial discrimination or retaliation. To establish a prima facie case of disparate treatment, a plaintiff must show that he: (1) is a member of a protected class, (2) is qualified for his job, (3) suffered an adverse employment action, and (4) was treated less favorably than other similarly situated employees outside his protected class. *McDonnell Douglas*, 411 U.S. at 802.

A plaintiff in an employment discrimination case does not need to present much evidence to defeat an employer's motion for summary judgment. This is because the core issue on whether discrimination occurred requires a thorough and detailed inquiry, best left to a factfinder after reviewing a complete record. *Chuang*, 225 F.3d at 1124, citing *Schnidrig v. Columbia Mach., Inc.,* 80 F.3d 1406, 1410 (9th Cir.1996). "The requisite degree of proof necessary to establish a prima facie case for Title VII ... on summary judgment is minimal and does not even need to rise to the level of a preponderance of the evidence." *Id.*, quoting *Wallis v. J.R. Simplot Co.*, 26 F.3d 885, 889 (9th Cir.1994).

Here, Defendant misrepresents Plaintiff's claims. Plaintiff explicitly states that he was the only African American Sales Consultant at Chas Roberts and the only employee affected by the pay changes. In 2018, Plaintiff alone met the criteria for the 1% commission, but Defendant raised the requirements to prevent him from receiving it.

Similarly, in 2023, Plaintiff's commission percentage was reduced by 3%, while his Caucasian colleagues were unaffected. **This change solely impacted Plaintiff because he was the only one meeting the necessary sales goal to earn his commissions.**

Defendant asserts that Plaintiff received raises in his commission percentage but overlooks the fact remains that Plaintiff's commission was reduced by 3%, returning him to his original commission agreement, immediately upon his return from FMLA leave. When Plaintiff started, his commission rates were 7%, 7.5%, and 8% based on his performance. In 2021, Plaintiff received a raise in commission rates to 9%, 9.5%, and 10% based on his performance. Prior to Plaintiff's FMLA leave, his rates were at the 9%, 9.5%, and 10% rates. However, immediately upon his return, Defendant's demanded Plaintiff's commission percentage go back down to the rates he started at 7%, 7.5%, and 7%. Furthermore, Plaintiff was explicitly informed on several occasions that the commission structure adjustments were made with the intention of preventing him, the only African American employee, from receiving his commission. As a result, Plaintiff has adequately established a prima facie case of racial discrimination under Title VII and § 1981.

Furthermore, courts have recognized that discriminatory pay reductions and terminations constitute adverse employment actions. *See Little v. Windermere Relocation, Inc.*, 301 F.3d 958, 970 (9th Cir. 2002) (holding that a reduction in base monthly pay was an adverse employment action even though with commission it might have equaled the same net pay); *Coszalter v. City of Salem*, 320 F.3d 968, 977 (9th Cir. 2003) (finding that

pay reductions can constitute adverse employment actions, provided there is a causal link to protected activity or discriminatory motive).

Plaintiff's employment ended when confronted Defendant regarding its discriminatory commission structure that Caucasian employees were not subject to, further supporting an inference of both discrimination and retaliation. Therefore, Plaintiff's claim of racial discrimination under Title VII and § 1981 should not be dismissed.

**D. Defendant's Motion Should Be Denied Because Plaintiff Has Stated a Valid FMLA Interference Claim.**

Plaintiff took FMLA leave from May 2023 to September 25, 2023. Once he returned, Defendant reduced his commission structure, ultimately forcing him out. Defendant argues that this does not constitute an FMLA interference claim.

To state a claim for FMLA interference, a plaintiff must allege the following: (1) he is an eligible employee; (2) his employer is covered under the FMLA; (3) he was entitled to take leave; (4) he gave notice of his intention to take leave; and (5) the defendant denied him the benefits to which he was entitled under the FMLA. *Sanders v. City of Newport*, 657 F.3d 772, 778 (9th Cir. 2011). "The FMLA creates two interrelated, substantive employee rights: first, the employee has a right to use a certain amount of leave for protected reasons, and second, the employee has a right to return to his or her job or an equivalent job after using protected leave." *Bachelder v. Am. W. Airlines, Inc.*, 259 F.3d 1112, 1122 (9th Cir. 2001).

A Plaintiff may state a claim for FMLA interference by showing that the taking of FMLA-protected leave was a factor in the decision to terminate him and/or take an adverse employment action, such as reducing their opportunities for a commission. *Id.* at 1122-23.

Defendant contends that Plaintiff has not alleged any attempts to deny additional leave or discourage him from using it. However, Defendant mischaracterizes Plaintiff's claims. The reduction in Plaintiff's commission upon his return from FMLA leave constitutes interference. Defendant's excuse that Plaintiff's work truck was messy fails to hold up**. Not only had Plaintiff not used his work truck for <u>four</u> months because he was on leave, but he also provided photos showing the truck in pristine condition.** This creates a strong inference that Defendant reduced Plaintiff's commission in direct retaliation for his protected leave.

Furthermore, Defendant argues that Plaintiff's claim regarding pay structure is a retaliation claim, not an interference claim. However, the Ninth Circuit allows for complaints alleging adverse employment actions taken against employees because they have used FMLA leave to be construed as claims of interference. *Id.* at 1124. Therefore, Plaintiff's claim of FMLA interference should not be dismissed.

**E. Plaintiff Has Established a Causal Link Between the End of His Employment and His Race, Complaints of Racism, FMLA Leave, and use of earned paid sick time.**

For the reasons set forth above, Plaintiff has demonstrated causal connections between his termination and Defendant's discriminatory and retaliatory actions, which support all the claims asserted in his Third Amended Complaint.

Defendant argues that Plaintiff's objection to, and refusal to sign, the new commission structure was the reason for his termination or resignation. However, Defendant overlooks the racist rhetoric and years of discriminatory policies that Plaintiff had endured. Defendant also fails to acknowledge that Plaintiff was informed the initial reduction to his commission percentage was made specifically to impact only him due to his race. Defendant also fails to acknowledge that its most recent change to the commission percentage meant that Plaintiff's commission percentage for certain sales was reduced by 3% while the percentages for his white counterparts remained the same. The most recent reduction occurred shortly after Plaintiff took FMLA leave. Defendant must articulate a legitimate reason for the change in his compensation structure. But at this stage, Defendant does not have the opportunity to do so. Therefore, dismissal would be premature.

**CONCLUSION**

Plaintiff respectfully requests that the Court deny Defendant's Partial Motion to Dismiss Plaintiff's Third Amended Complaint in its entirety. Plaintiff also requests leave under Rule 15 to address any deficiencies the Court identifies.

/s/ *Jeffrey Silence*
Jeffrey Silence
**SILENCE LAW GROUP PLLC**
20235 N. Cave Creek Blvd Ste 104 #460
Phoenix, AZ 85024
(602) 932- 8358
:jeff@silencelaw.com

***Certificate of Service***

I hereby certify that on this 21st day of May, 2025, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing.

/s/ Jeffrey Silence